## Hogan v. Fausz et al.

(Decided April 26, 1932.)

ROGERS & ROGERS for appellant.

S. W. ADAMS for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Emmett Hogan appeals from a judgment of the Kenton circuit court sustaining the action of the mayor and board of commissioners of the city of Covington in removing him from the police department of the city.

Covington is a city of the second class. Policemen and firemen in cities of that class are appointed on the merit system, section 3138-3, Kentucky Statutes, and

may not be removed or reduced in grade or pay except for inefficiency, misconduct, insubordination, or violation of law, or of the rules adopted by the commissioners, of which written charges shall be made setting out with clearness and distinctness each and every charge. Section 3138-4, Kentucky Statutes. In case the officer is suspended for a particular period, or reduced in grade or removed from the force, he may appeal to the circuit court of the county in which the city may be located, and thence to this court. Section 3138-5, Kentucky Statutes. The charges against Hogan, which were signed by Herman J. Fausz, acting chief of police, are as follows:

"That said Emmett Hogan was, while on police duty in said police department, guilty of the offense of inefficiency, misconduct and violation of law and of the rules adopted by said Board of Commissioners in that the said Emmett Hogan did on or about the 15th day of June, 1930, while threatening to arrest two unknown negroes and charging them with the offense of transporting intoxicating liquor in the City of Covington, did, together with Jess Sanders, another police officer of said Department, and one Ed Chevalier, a merchant police officer of said city, take from said unknown negroes, the sum of $13.50 then and there releasing them from his custody, after conspiring and agreeing with said Ed Chevalier and Jess Sanders to divide said money between them, appropriated a part of said $13.50 to his own use and failed to make any report of said act to his superior officer or to the Police Department of said city, all of which is in violation of section 3138-4, Kentucky Statutes, Carroll's 1930 Edition.

"Your petitioner further charges that said Emmett Hogan by reason of the above offense committed by him, manifested his unwillingness to enforce the law in that he failed and refused to arrest said negroes and charge them with transportating intoxicating liquor in the City of Covington and then and there released them from custody in consideration of their turning over to him said sum of $13.50."

At the time of the transaction referred to in the charges, Hogan and Jess Sanders, another policeman of

516

the city of Covington, were assigned to duty in Latonia, and Edward Chevalier was employed by the merchants as a policeman. In support of the charges Jess Sanders testified in substance as follows: He, Hogan, and Chevalier were together. They saw a machine stop near the lower gate of the race track and went down to investigate what was going on. When they got there they found two negro women and three negro men, who had gotten out of the machine. The women were walking down the east side of Winston avenue, and the men walked down the center of the street in front of the machine, which was on Winston avenue near the city limits, and about 50 or 75 feet north of an old negro shack. Hogan went down, got the negro women, and brought them back. Witness got out and walked the negro men. Chevalier, who had been riding in the back seat of the police car, got out and was coming around the car on the west side of Winston avenue. He had a shopping bag which contained a jug of moonshine whisky about two-thirds full, and two or three bottles of beer. Chevalier asked the negroes who owned the liquor, but none of them claimed it. Hogan then threw the "moon" over on the east side of Winston avenue against a pole. Chevalier kept the sack. The left rear door of the car was standing open, and on the floor were two or three bottles of beer. That was also thrown out. When they reached Thirty-Eighth street on their return, Chevalier shook the bag and said, "Look what's in here." The bag contained some money which was divided among the three, Chevalier, Hogan, and the witness. Chevalier said that he found the money in the sack, and that the sack was setting over on Winston avenue in the weeds not very far from the car. At the time the money was divided the negroes had gone. On cross-examination witness stated that he never at any time saw the negroes have the "moon" or the sack. They did not arrest, or attempt to arrest, the negroes. No money was demanded of the negroes in consideration of their release. There was also introduced in evidence the rules and regulations of the department of public safety. Section 23 of the rules is as follows: "All property coming into his possession in his official capacity, he shall carefully preserve, mark and place in the hands of the officer in charge at police headquarters, without delay." There was further evidence that Hogan made no report of the transaction,

and did not return the money which he had received to the police department.

By way of defense, Hogan, after introducing three witnesses, who testified that his reputation was good, testified as follows: On the night in question, he, Chevalier, and Jess Sanders were in the police car, which was being driven by Sanders. They had had complaints about rowdiness and negroes taking ''moon'' down to the race track. While at Ritte's corner they saw a taxi go down and make a turn. When they got to the place where it turned, they saw two negroes going down the center of the road and two women going into the shack on the left-hand side of the road. He got out of the machine and walked toward the shack to head off the negro women. The men were in the middle of the road, and Jess Sanders walked down after them. He brought the negro women back, and Jess Sanders brought the men. He did not know as a matter of fact whether the negroes got out of the taxi or not. About that time Chevalier called to them. Chevalier had a sack, which he said he found in the weeds in a gully alongside of the road. He did not know anything about the ''moon'' until Chevalier pulled the ''moon'' out of the sack and set it on the side of the road, and also pulled out about two bottles of beer. He then started to say something, but Chevalier kept him from saying anything. He got ''kind of sore'', and made some remark about Chevalier's taking care of himself, and then got back in the police car. He then took the ''moon'' and the beer and threw them at a pole. Jess Sanders reached down and threw three more bottles that had been in the sack against the same post. There was no machine at that time anywhere close. At no time was any threat made to arrest the negroes. He did not make any inquiry of the negroes, but started to make one and was told to keep quiet. They denied to him that they owned the ''moon.'' That was the question he asked him. Chevalier and Sanders asked a lot of questions. They were not there five minutes. None of the colored folks gave him any money. They were never taken into custody and placed under arrest. When they got back to Ritte's corner, Chevalier got out of the machine and gave Jess some money. He got the money out of the side of the car as he got out of the machine. He knew the money was in the pocket of the car because

he saw Jess put it there. Jess said, "Here's this money", and he knew that Jess meant it for him. He did not think Chevalier was making him a present of the money. He was told why it was given to him. Jess Sanders said it was in the bag that Chevalier had found on the outside of town. He never made any report to police headquarters in reference to the matter, as he did not find the money, and did not think it was necessary.

We think the charges were sufficiently specific to inform appellant of the nature and circumstances of the accusation, and to enable him to prepare his defense. It remains to determine whether the evidence is reasonably sufficient to uphold the board of commissioners. If it is, their action will not be disturbed. Williams v. City of Newport, 229 Ky. 810, 18 S. W. (2d) 283. Briefly stated, the facts shown are these: Appellant and Sanders were in charge of the police car, and they, together with Chevalier, started for the race track in the performance of their official duties. They had seen the car in which the negroes were driving, and suspected the negroes. On approaching they saw the negroes in the road, and went to head them off. Chevalier found on the side of the road a bag containing liquor. In the bag at the time was some money. If appellant took the liquor out of the bag he must have seen the money. If not, he was informed where the money came from. The negroes were released on their statement that the liquor did not belong to them, although there was other liquor in the car at the time. The money was afterwards divided between Chevalier, Sanders, and appellant, and appellant knew where the money came from. It is true that there was no evidence that the negroes bargained with the officers for their release in consideration of the money placed in the sack, but the facts must not be overlooked. The circumstances were such as to make it reasonably certain that the liquor in the sack belonged to the negroes. Those engaged in transporting liquor do not carry their money in the same sack, and those who throw their liquor away to avoid arrest are not in the habit of throwing their money away at the same time. There is but one conclusion to be deduced, and that is that the money was placed in the sack with the expectation that when the sack was opened it would be discovered, and would be accepted by the officers as an inducement to forego the making of any arrests. The plan worked to perfection,

and, although the evidence pointed unerringly to the guilt of the negroes, they were permitted to go upon their mere statement that they did not own the liquor. Even if appellant got sore because Chevalier insisted on releasing the negroes, he was not under the control of Chevalier and he should have carried his soreness further than merely acquiescing in the arrangement. If, as a matter of fact, appellant did not know that the money was in the sack at the time, and honestly believed that the negroes were not guilty of any offense, and that had been all, there might be some basis for the claim that appellant's conduct was excusable. But the case goes further. With knowledge of the fact that the money was found in the sack, and that it had been placed there by the negroes as an inducement to let them go, appellant, while acting in his official capacity as a policeman, accepted his portion of the money, appropriated it to his own use, and failed to make any report of the transaction to police headquarters. Whether the facts make out a case of actual bribery, we need not determine. In our opinion they are sufficient to show such official misconduct and violation of the rules adopted by the commissioners as to sustain their action in removing appellant from the police force.

Judgment affirmed.